UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GINETTE BONE                                            CIVIL ACTION

VERSUS                                                  NO. 14-2788

KELLI DUNNAWAY, ET AL.                                 SECTION I

ORDER AND REASONS

The Court has pending before it a motion[1] for summary judgment which plaintiff, Ginette Bone ("Bone"), opposes,[2] seeking dismissal of plaintiff's 42 U.S.C. § 1983 claims (1) against defendant, New Orleans Police Department ("NOPD") officer Kelli Dunnaway ("Dunnaway"), for false arrest, and (2) against defendant, NOPD detective Bryan Jones ("Jones"), for excessive force. Dunnaway, Jones, and defendant, the City of New Orleans,[3] also request that the Court decline to exercise supplemental jurisdiction over plaintiff's remaining state-law claims.[4] For the following reasons, the motion is **GRANTED**.

---

[1]R. Doc. No. 29. The Court also has pending before it a motion for judgment on the pleadings raising essentially the same arguments based solely on the facts alleged in the pleadings. R. Doc. No. 22. Under these circumstances, the Court finds it appropriate to decide the motion for summary judgment and to dismiss the motion for judgment on the pleadings as moot.

[2]R. Doc. No. 31.

[3]As to the City of New Orleans, plaintiff alleges state-law *respondeat superior* liability. R. Doc. No. 1, at 8-9. At a status conference on June 29, 2015, with the consent of the parties, the Court dismissed with prejudice any claims against the City of New Orleans arising under federal law. R. Doc. No. 28.

[4]R. Doc. No. 29-1, at 11-12.

1

**BACKGROUND**

This case arises out of plaintiff's arrest after an incident in the French Quarter of New Orleans, Louisiana.[5] At 10:00 p.m. on Saturday, December 14, 2013, plaintiff and two companions had finished eating dinner at a restaurant at the corner of North Peters Street and Bienville Street.[6] Plaintiff denies that she had been drinking.[7] Through a window, plaintiff observed an SUV parked on Bienville "in the no-parking zone, with the window on the passenger side repeatedly being wound down and trash being thrown onto the sidewalk from the vehicle."[8]

One of plaintiff's dinner companions left the restaurant and tapped on the passenger window of the SUV, and "there were obviously words exchanged."[9] The companion returned, but more trash was thrown from the rolled-down window "the minute his back was turned."[10] At that point, plaintiff went outside because she was "sick of watching people throw trash on the sidewalk and not picking it up."[11] Then, as she explained at her deposition:

> I picked up–I carefully picked up trash that was scattered around and I placed it inside one of the polystyrene containers that was on the ground by the car, and I probably–it was probably a little bit dramatic, but I was making a point. I very gently placed it on the bonnet[12] of the car.[13]

As plaintiff turned and walked away, a "girl got out of the car" and asked, "Why did you put

---

[5]The Court will recite the facts in the light most favorable to plaintiff. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).
[6]R. Doc. No. 29-6, at 11, 16.
[7]R. Doc. No. 29-6, at 13, 15.
[8]R. Doc. No. 29-6, at 20.
[9]R. Doc. No. 29-6, at 20.
[10]R. Doc. No. 29-6, at 20.
[11]R. Doc. No. 29-6, at 21.
[12]Plaintiff is British. R. Doc. No. 29-6, at 35.
[13]R. Doc. No. 29-6, at 22.

trash on my car?" to which plaintiff responded, "Why did you put it on the pavement?"[14] Plaintiff characterized the occupant's tone as "[i]ndignant" but not "threatening."[15]

A total of four women ultimately exited the SUV.[16] According to plaintiff, the encounter with the SUV occupants escalated to the point where the occupants "were getting awfully kind of excited about the fact that I put trash on their car."[17] Plaintiff responded by "pointing out that . . . [she thought] that it's really disrespectful to throw trash on the ground."[18] However, plaintiff denies that she threatened or argued with the occupants of the SUV.[19]

At that point, another of plaintiff's dinner companions flagged down a passing police vehicle[20] driven by Dunnaway.[21] Dunnaway requested backup by radio before she even exited her vehicle.[22] She then exited her vehicle and, according to plaintiff, the driver of the SUV began "screaming at" Dunnaway.[23] A "pretty heated discussion" ensued between Dunnaway and the SUV driver.[24] Subsequently, Jones arrived on the scene in a second police car in response to Dunnaway's radio request for assistance.[25] Plaintiff's two dinner companions "walked up because they had seen that there was a discussion going on" and they "probably felt protective or something."[26]

According to Dunnaway, the SUV driver told her that she (the driver) had put trash on a trash

---

[14]R. Doc. No. 29-6, at 24.
[15]R. Doc. No. 29-6, at 25.
[16]R. Doc. No. 29-4, at 30; R. Doc. No. 29-5, at 1; R. Doc. No. 29-8, at 20.
[17]R. Doc. No. 29-6, at 26.
[18]R. Doc. No. 29-6, at 26.
[19]R. Doc. No. 29-6, at 51.
[20]R. Doc. No. 29-6, at 27.
[21]R. Doc. No. 29-4, at 25.
[22]R. Doc. No. 29-4, at 31.
[23]R. Doc. No. 29-6, at 29.
[24]R. Doc. No. 29-6, at 29.
[25]R. Doc. No. 29-4, at 31; R. Doc. No. 29-6, at 30; R. Doc. No. 29-8, at 15-16.
[26]R. Doc. No. 29-6, at 28.

3

can, not on the ground, and that plaintiff "took the trash off the trash can and placed it on their vehicle."[27] Plaintiff could not hear what the vehicle occupants told Dunnaway.[28]

After speaking with the SUV occupants, Dunnaway approached plaintiff who was leaning against a wall.[29] Dunnaway asked for plaintiff's driver's license and asked if plaintiff had placed trash on the SUV.[30] Plaintiff confirmed to Dunnaway that she had placed trash on the SUV and "gladly gave the officer [her] license," believing herself to be "a witness to this."[31] Dunnaway stated that based on what she was told at the scene she "had two different stories" regarding the source of the trash that was placed on the hood of the SUV: the occupants of the SUV "said they had placed the trash on the trash can," but plaintiff "said that they placed it on the ground."[32]

Plaintiff attempted to go back into the restaurant and escape the cold, but plaintiff was told by Jones that she could not leave.[33] Instead, plaintiff sat "for what seemed like awhile" in the back of Jones' vehicle.[34] Plaintiff exited Jones' vehicle again when Dunnaway came over.[35] Dunnaway presented plaintiff with a clipboard and told her to "sign this."[36] Plaintiff asked, "Well, what am I signing?" to which Dunnaway allegedly responded, "It's an order to appear in court on Monday."[37] Plaintiff said, "Well, I'm not signing this," and "turned at that point to walk away."[38] Plaintiff

---

[27]R. Doc. No. 29-4, at 32.
[28]R. Doc. No. 29-6, at 29.
[29]R. Doc. No. 29-6, at 30.
[30]R. Doc. No. 29-6, at 30-31.
[31]R. Doc. No. 29-6, at 31.
[32]R. Doc. No. 29-4, at 40.
[33]R. Doc. No. 29-6, at 31.
[34]R. Doc. No. 29-6, at 32.
[35]R. Doc. No. 29-6, at 33.
[36]R. Doc. No. 29-6, at 34.
[37]R. Doc. No. 29-6, at 34.
[38]R. Doc. No. 29-6, at 34.

alleged in her complaint that she also said, "I've done nothing wrong, you must be joking."[39]

As plaintiff turned to walk away, Jones "grabbed [plaintiff] very forcefully from behind," twisted a hand behind her back and "slammed [her] face up against the window."[40] Plaintiff was "surprised that [she] didn't break the window."[41] She characterizes it as "a very violent slam," but she does not "think it was necessarily intended to be" violent.[42] This treatment resulted in "[j]ust bruising" around her wrists, "fingerprints on [her] arms where [she] had been grabbed," and "a swollen cheek where [she] had been thrown up against the window."[43] She "probably" would have gone to a doctor if she had medical insurance, but she instead treated her bruises with witch hazel.[44]

Plaintiff was transported to Orleans Parish Prison.[45] An affidavit signed by Dunnaway in connection with the arrest cites plaintiff for disturbing the peace by tumultuous behavior in violation of New Orleans Municipal Code § 54-403, and resisting an officer in violation of § 54-441.[46] The undisputed record reflects that Dunnaway cited the occupants of the SUV for disturbing the peace and littering, but plaintiff was the only person arrested at the scene.[47]

Plaintiff filed the above-captioned complaint on December 10, 2014, against Dunnaway, Jones, and the City of New Orleans.[48] She alleges that Dunnaway and Jones violated her Fourth

---

[39]R. Doc. No. 1, at 4.
[40]R. Doc. No. 29-6, at 37.
[41]R. Doc. No. 29-6, at 38.
[42]R. Doc. No. 29-6, at 38.
[43]R. Doc. No. 29-6, at 39-40.
[44]R. Doc. No. 29-6, at 40.
[45]R. Doc. No. 29-6, at 43; R. Doc. No. 29-4, at 52.
[46]R. Doc. No. 31-13, at 1.
[47]R. Doc. No. 29-4, at 36, 40. The record does not reflect the disposition of the charges against plaintiff.
[48]R. Doc. No. 1. Plaintiff amended the complaint once to identify Jones as a defendant, but plaintiff made no other substantive changes. R. Doc. No. 15.

Amendment rights and also committed numerous violations of state law.[49]

## STANDARD OF LAW

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the court determines there is no genuine issue of material fact. *See* Fed. R. Civ. P. 56. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. *Id.*; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56, the nonmoving party must come forward with specific facts showing that there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.* The nonmoving party's evidence,

---

[49]R. Doc. No. 1, at 7-8.

however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

## ANALYSIS

Bone and Dunnaway move for summary judgment and invoke qualified immunity as to plaintiff's § 1983 claims against them for false arrest and excessive force, respectively.[50] The Court will (1) set forth the general framework applicable to the affirmative defense of qualified immunity; (2) explain why, even viewing the evidence in the light most favorable to plaintiff, Bone and Dunnaway are entitled to qualified immunity, and (3) address plaintiff's state-law claims.

## A.    Qualified Immunity Standard

"'The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009) (quoting *Pearson v. Callahan*, 555 U.S. 223 (2009)). "When a defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense." *Id.* "To discharge this burden, a plaintiff must satisfy a two-prong test." *Id.* (internal quotation marks omitted). "First, he must claim that the defendants committed a constitutional violation under current law." *Id.* (internal quotation marks omitted). "Second, he must claim that the defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of." *Id.* (internal quotation marks omitted). "The second prong of the analysis is better understood as two separate inquiries: whether the allegedly violated

---

[50]During a telephone conference on August 19, 2015, counsel for plaintiff confirmed that plaintiff's § 1983 claims are for false arrest as to Dunnaway and excessive force as to Jones.

constitutional rights were clearly established at the time of the incident; and, if so, whether the conduct of the defendants was objectively unreasonable in light of that then clearly established law." *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005) (internal quotation marks and citations omitted). The Court can consider either prong first. *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013). "Whether an official's conduct was objectively reasonable is a question of law for the court, not a matter of fact for the jury." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

"Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law, and courts will not deny immunity unless existing precedent placed the statutory or constitutional question beyond debate." *Whitley*, 726 F.3d at 638 (internal quotation marks and citations omitted). "Unless *all* reasonable officers in the defendants' circumstance would have known that the conduct in question violated the constitution, the defendant is entitled to qualified immunity." *Batiste v. Theriot*, 458 F. App'x 351, 354 (5th Cir. 2012).

**B.      Plaintiff's Claim Against Officer Dunnaway**

Plaintiff asserts a § 1983 false arrest claim against Dunnaway. With respect to the first prong of the qualified-immunity analysis, *i.e.*, whether Dunnaway committed a constitutional violation, "[t]he constitutional claim of false arrest requires a showing of no probable cause." *Club Retro*, 568 F.3d at 204. "The Supreme Court has defined probable cause as the 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Id.* (internal quotation marks omitted). "The police officer's knowledge must establish that there was a fair probability that a crime occurred." *United States v. Nunez-Sanchez*, 478 F.3d 663, 666-67 (5th Cir. 2007) (internal quotation marks omitted). "The requisite fair

probability is something more than a bare suspicion, but need not reach the fifty percent mark." *Id.* at 667 (quotation marks and alteration omitted). "When considering what a reasonable person would have concluded, [the Court] take[s] into account the expertise and experience of the law enforcement officials." *Id.* Furthermore, "evidence that the arrestee was innocent of the crime is not necessarily dispositive of whether the officer had probable cause to conduct the arrest because 'probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009).

"If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Lockett v. New Orleans City*, 607 F.3d 992, 998 (5th Cir. 2010) (internal quotation marks omitted).[51] This is an objective standard, "which means that [the Court] will find that probable cause existed if the officer was aware of facts justifying a reasonable belief that an offense was being committed, whether or not the officer charged the arrestee with that specific offense." *Club Retro*, 568 F.3d at 204.

With respect to the second prong, *i.e.*, whether Dunnaway's actions were objectively unreasonable in light of clearly established law, "[t]he Fourth Amendment right to be free from false arrest [*i.e.*, an] arrest without probable cause," is clearly established. *Club Retro*, 568 F.3d at 206. The question, then, is whether Dunnaway's conduct "was objectively unreasonable in light of that then clearly established law." *Tarver*, 410 F.3d at 750 (internal quotation marks and citations omitted). Pursuant to the second prong, "even law enforcement officials who reasonably but

___

[51]*See also Fields v. City of South Houston*, 922 F.2d 1183, 1189 (5th Cir. 1991) (holding that the Fourth Amendment authorizes warrantless arrests based on probable cause "for misdemeanors *not* occurring in the presence of the arresting officers") (emphasis added).

mistakenly conclude that probable cause is present are entitled to immunity." *Club Retro*, 568 F.3d at 204 (internal quotation marks omitted); *see also Tarver*, 410 F.3d at 750 ("A police officer who reasonably but mistakenly concludes that he has probable cause to arrest a suspect is entitled to qualified immunity.").

Accordingly, "as applied to a warrantless arrest, officers are entitled to qualified immunity unless there was not probable cause for the arrest *and* a reasonable officer in their position could not have concluded that there was probable cause for the arrest." *Cooper v. City of La Porte Police Dep't*, 608 F. App'x 195, 198 (5th Cir. 2015) (emphasis added). Plaintiff "must clear a significant hurdle to defeat qualified immunity." *Brown v. Lyford*, 243 F.3d 185, 190 (5th Cir. 2001). "There must not even arguably be probable cause for the . . . arrest for immunity to be lost." *Id.* (some alterations and internal quotation marks omitted).

In this case, prior to plaintiff being arrested by Jones, Dunnaway attempted to cite plaintiff with a summons for disturbing the peace by tumultuous behavior in violation of New Orleans Municipal Code § 54-403. The ordinance in question defines "disturbing the peace by tumultuous behavior" as intentional performance of a list of acts including "act[ing] in a violent or tumultuous manner toward another whereby any person is placed in fear of safety of his life, limb or health" and "act[ing] in a violent or tumultuous manner toward another whereby the property of any person is placed in danger of being destroyed or damaged." New Orleans Mun. Code § 54-403(b)(6)-(7).[52]

---

[52]The Court notes that the Municipal Code also criminalizes an attempt to commit a violation of the municipal code. New Orleans Mun. Code § 54-61(a) ("A person is guilty of an attempt to commit a crime, if, with an intent to commit a crime, he does or commits any act for the purpose of and tending directly towards the accomplishing of his object; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.").

10

The Court concludes that plaintiff fails at the second prong of the qualified-immunity analysis because Dunnaway was not objectively unreasonable in concluding that plaintiff committed or attempted to commit the offense of disturbing the peace by tumultuous behavior. Viewing the facts known to Dunnaway in a light most favorable to plaintiff, Dunnaway was flagged down to the scene of an encounter between plaintiff and four "very excited" women at 10:00 p.m. in the French Quarter. Dunnaway immediately requested backup before exiting her vehicle. The driver of the SUV "screamed" at Dunnaway and told Dunnaway that the catalyst for the situation was that plaintiff had taken trash off of a trash can and placed it on her vehicle. Although it is a disputed fact whether plaintiff merely placed the driver's own litter on the SUV or whether she took the arguably more provocative action of taking trash off of a trash can and placed it on the SUV, there is no evidence in the record to contradict that Dunnaway was *told* both versions; plaintiff could not hear what the SUV driver told Dunnaway. *See Cooper*, 608 F. App'x at 200 ("Importantly, while [plaintiff] disputes the accounts given by the eyewitnesses, she does not dispute that they gave these accounts to the police over the phone and at the scene.").[53] Furthermore, upon questioning, plaintiff admitted to Dunnaway that she had placed trash on the hood of the SUV (though not trash off of a trash can). On the basis of the undisputed facts, the context of an "excited" group encounter late at night in the French Quarter, the conflicting stories, and Dunnaway's experience as a law enforcement official, the Court cannot say that there was "not even arguably" probable cause that plaintiff had instigated the entire situation and disturbed the peace or attempted to disturb the peace as that conduct is

---

[53]Accordingly, any factual dispute as to what *actually* occurred is not material to the question of what information was within Dunnaway's knowledge at the time. *See id.* ("It is immaterial to the probable cause determination whether Cooper *actually* abandoned her children or placed them in a dangerous situation. . . . [The] officer was entitled to credit the eyewitness statements and to disbelieve [plaintiff's] denial of their statements.").

defined by the New Orleans Municipal Code. *See Brown*, 243 F.3d at 190.

Plaintiff's arguments to the contrary are unpersuasive. She contends that her arrest was constitutionally unreasonable because it is not against the law "for an individual to place an object on someone's car" or "to talk to the owner of that car after you place the object on the car."[54] However, such an abstract statement of the facts known to Dunnaway ignores the context and totality of the "facts and circumstances" relevant to the probable cause analysis. *See Club Retro*, 568 F.3d at 204.

Plaintiff also argues that Dunnaway decided to arrest plaintiff because plaintiff was arguing, a fact which plaintiff disputes.[55] However, even resolving that dispute in plaintiff's favor for the purposes of summary judgment, Dunnaway's determination of probable cause to arrest the plaintiff was not objectively unreasonable based on the *undisputed* facts known to Dunnaway. *See id.* Plaintiff has not met her burden with respect to the second prong of the false-arrest qualified immunity analysis and the motion for summary judgment should be granted as to the false-arrest claim.[56]

---

[54]R. Doc. No. 31, at 18. Plaintiff also asserts without elaboration that she has a "First Amendment Right to express herself," but she does not otherwise develop this argument which the Court finds to be waived. R. Doc. No. 31, at 12.

[55]R. Doc. No. 31, at 10.

[56]Accordingly, the Court does not reach defendants' alternative argument that if Dunnaway lacked sufficient probable cause to *arrest* plaintiff, she nonetheless had a lesser degree of suspicion sufficient to *cite* plaintiff for disturbing the peace and probable cause to arrest plaintiff after plaintiff refused to sign the summons. *See* R. Doc. No. 29-1, at 7-8 (citing New Orleans Mun. Code § 54-28). The Court notes that defendants' proposed interpretation of § 54-28 could be problematic. *Cf. Deville v. Marcantel*, 567 F.3d at 164-65 (noting that a roughly analogous Louisiana statute which "permits officers to make full-custody arrests of persons who refuse to sign a traffic ticket, in lieu of issuing the usual citation" "does not establish a criminal offense; it only establishes the procedure for arrests when a traffic offense has already occurred").

### C.  Plaintiff's Claim Against Detective Jones

An excessive force claim "is separate and distinct from [an] unlawful arrest claim, and [the Court] must therefore analyze the excessive force claim without regard to whether the arrest itself was justified." *Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir. 2007). The Court must "'make two overlapping objective reasonableness inquiries'" when conducting the qualified immunity analysis in excessive force cases. *Sanchez v. Fraley*, 376 F. App'x 449, 451 (5th Cir. 2010) (quoting *Lytle v. Bexar County*, 560 F.3d 404, 410 (5th Cir. 2009)) (internal quotation marks omitted).  As stated by the Fifth Circuit,

> Allegations that an officer used excessive force in conducting a seizure complicates the *Saucier* inquiry. This complexity stems from having to make two "overlapping objective reasonableness inquir[ies]." [*Saucier v. Katz*, 533 U.S. 194, 210 (2001)] (Ginsburg, J., concurring in the judgment). We must first answer the constitutional violation question by determining whether the officer's conduct met the Fourth Amendment's reasonableness requirement, as discussed below. If we find that the officer's conduct was not reasonable under the Fourth Amendment, we must then answer the qualified immunity question by determining whether the law was sufficiently clear that a reasonable officer would have known that his conduct violated the constitution. In other words, at this second step, we must ask the somewhat convoluted question of whether the law lacked such clarity that it would be reasonable for an officer to erroneously believe that his conduct was reasonable.

*Lytle*, 560 F.3d at 410.

With respect to the first prong, to succeed on an excessive force claim, a plaintiff must show that he "'suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable.'" *Ballard v. Burton*, 444 F.3d 391, 402 (5th Cir. 2006) (quoting *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004)). "Assessing the reasonableness of a police officer's use of force involves 'a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Lytle*, 560 F.3d at 411 (quoting *Graham v. Connor*,

13

490 U.S. 386, 396 (1989)) (internal quotation marks omitted). Some of the factors the Court considers are "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Deville*, 567 F.3d at 167 (quoting *Graham*, 490 U.S. at 396). "'To gauge the objective reasonableness of the force used by a law enforcement officer,'" the Court "'must balance the amount of force used against the need for force,' paying 'careful attention to the facts and circumstances of each particular case.'" *Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008) (quoting *Flores*, 381 F.3d at 399).

> Government officers are also entitled to deference:
>
> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation.

*Id.* at 396-97.

With respect to the second prong of the qualified immunity analysis in the excessive-force context, there is a second reasonableness inquiry into "whether the right [to be free from excessive force] was clearly established such that a reasonable officer would know that the particular level of force used was excessive." *Hogan v. Cunningham*, 722 F.3d 725, 735 (5th Cir. 2013). "While the right to be free from excessive force is clearly established in a general sense, the right to be free from the degree of force used in a given situation may not have been clear to a reasonable officer at the scene." *Id.* "To say that the law was clearly established," the Court "must be able to point to controlling authority–or a 'robust consensus of persuasive authority'–that defines the contours of the right in question with a high degree of particularity." *Id.* (internal quotation marks omitted). "In

14

the end, the question is whether the right is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* (internal quotation marks omitted).

Viewing the evidence in the light most favorable to plaintiff, the Court concludes as a matter of law that plaintiff's excessive-force claim fails at the second prong of the qualified-immunity analysis. It is undisputed that plaintiff unambiguously refused to sign a citation for disturbing the peace, and that plaintiff turned to walk away from Dunnaway after that refusal. In response, Jones physically grabbed plaintiff and "slammed" her against a nearby window, resulting in "bruising" and a "swollen cheek." The constitutional analysis includes whether an arrestee was "attempting to evade arrest by flight," *Collier*, 569 F.3d at 219, which was not an objectively unreasonable conclusion for Jones to draw under the circumstances. Plaintiff has not cited controlling authority, or even a "robust consensus of persuasive authority," clearly establishing with the requisite "high" degree of particularity, that the contours of the Fourth Amendment prohibited this exercise of force under these circumstances.[57] *See Hogan*, 722 F.3d 735. Accordingly, the motion should be granted as to plaintiff's excessive-force claim.

**D.      Plaintiff's State-Law Claims**

---

[57]The cases to which plaintiff attempts to analogize these facts are inapposite. *Carter v. Wilkinson* is a decision issued after trial of a prisoner's Eighth Amendment excessive force claim in which a correctional officer "attacked [the plaintiff], choking him around the [neck] or upper chest area and aggressively slamming or shoving him against the wall" without provocation. *See* 2010 WL 5125499, at *4 (W.D. La. Dec. 9, 2010). That case has little applicability here.

Plaintiff also refers to *Glenn v. City of Tyler*, in which the Fifth Circuit held that "handcuffing too tightly, without more, does not amount to excessive force." 242 F.3d 307, 314 (5th Cir. 2001). Plaintiff contends that her injuries "exceed those incidental to handcuffing," R. Doc. No. 31, at 22, but *Glenn* did not involve an arrestee who turned away from officers; accordingly, *Glenn* likewise does not clearly establish that the force Jones used was clearly excessive.

15

Defendants also move the Court, pursuant to 28 U.S.C. § 1367(c), to decline to exercise supplemental jurisdiction over plaintiff's remaining state-law claims.[58] Plaintiff cursorily urges the Court to exercise supplemental jurisdiction over plaintiff's state-law claims, but she does not articulate any particular reason why the Court should do so.[59]

Section 1367(c) gives district courts the discretion to decline to exercise supplemental jurisdiction over supplemental state law claims. The statute requires the court to consider "(1) whether the state claims raise novel or complex issues of state law; (2) whether the state claims substantially predominate over the federal claims; (3) whether the federal claims have been dismissed; and (4) whether there are exceptional circumstances or other compelling reasons for declining jurisdiction." *Enochs v. Lampasas County*, 641 F.3d 155, 159 (5th Cir. 2011) (citing 28 U.S.C. § 1367(c)). "[A] federal court should [also] consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *accord Enochs*, 641 F.3d at 159; *see also Batiste v. Island Records, Inc.*, 179 F.3d 217, 226-27 (5th Cir. 1999).

Generally, "if all the federal law claims are dismissed prior to trial, a district court should dismiss the state law claims." *Sprague v. Dep't of Family & Prot. Servs.*, 547 F. App'x 507, 509 (5th Cir. 2013); *see also Bass v. Parkwood Hosp.*, 180 F.3d 234, 246 (5th Cir. 1999). "[I]t is clear that

---

[58]R. Doc. No. 29-1, at 11.
[59]R. Doc. No. 31, at 24. Plaintiff has not asserted that dismissal without prejudice of her state-law claims would result in any prescription or statute of limitation issues with respect to pursuing those claims in state court.

16

a district court has wide discretion to refuse to hear a pendent state law claim." *Robertson v. Neuromedical Ctr.*, 161 F.3d 292, 296 (5th Cir. 1998).

Considering the circumstances of this case, the relevant factors, the general rule, and the lack of any specific reason articulated by plaintiff for continued exercise of jurisdiction over plaintiff's state-law claims, the Court finds that the motion should be granted as to the state-law claims and that those claims should be dismissed without prejudice.

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that defendants' motion for partial summary judgment is **GRANTED** and that plaintiff's § 1983 false-arrest and excessive-force claims against defendants, Dunnaway and Jones, are **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that plaintiff's claims arising under state law are **DISMISSED WITHOUT PREJUDICE** reserving plaintiff's right to pursue her claims arising under state law in state court.

**IT IS FURTHER ORDERED** that defendants' motion for judgment on the pleadings is **DISMISSED AS MOOT**.

New Orleans, Louisiana, August 24, 2015.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

17